Good morning, Your Honors, and may it please the Court. I'm dividing my time with Mr. Perry. I'd like to reserve two minutes for rebuttal, if possible. I propose to focus primarily on the 102 issues that were decided by the SEC. He's going to focus primarily on the sanction and the appointments clause issues. On the other hand, obviously, I'm happy to discuss anything the Court wants to discuss. With respect to the 102 issues, it seems to me that I want to begin with the internal controls component of this case because it's, at least from my perspective, the most baffling part of the SEC's opinion. Internal controls are exactly as they say. They are controls that are constructed internally within the corporation. And for every one of the appraisals that was involved in this dispute, there were three levels of control. There was, first, the initial origination, and then there was the creation of the FAST 114 templates. Those were done by different people. And then there was the controller, who was, again, a separate individual, who evaluates every single one of those templates and makes a judgment as to the size of the reserves that have been taken. And then, finally, there's a full separate committee of 11 members of the corporation who evaluate every single one of them. And, again, all evaluating exactly the same thing, is have they, in fact, adequately reduced the reserves in order to recognize that the value of those properties has declined, that the value of the collateral has declined. I don't know what more the commission could have asked us to do because those were all aimed directly at solving the problem. And it was a problem that OTS had recognized. It was a problem that OTS accepted as having been fully satisfied and taken care of in June of 2008. And so, from my perspective, there's simply no evidence of what it is that we did wrong with respect to dealing with internal controls. And that then takes you to what I perceive as sort of the next least justifiable argument, which is the 09 appraisals. And that, to me, at least, is the clearest illustration of the commission looking in hindsight. Because the reality here is if this company doesn't go belly up, if this bank doesn't go belly up in intent, nobody would have blinked an eye about taking 09 appraisals and attaching to them reserves in 09. I mean, it's not like they ignored these. They recognized the appraisals came in, they took them into account, and they put them into the accounting for the first quarter of 09. That's standard operating procedure. And not even the commission's expert was prepared to testify that the 09 appraisals would have affected the 08 audit itself and the report itself. They would have to be restated. And our expert categorically said, no, there would be no basis for that. And, again, to me, the commission simply punted, saying, well, they might have been able to do more. Well, again, I don't think that's a basis on which you'd deprive somebody of his professional livelihood. And then the last element of the 102 findings would be, obviously, the ALLL analysis itself. And there, it seems to me, the real problem is that the commission has adopted a completely new standard applied after the fact, eight years after the fact. And, again, you've got to put yourself in the context of 08. It's the Great Recession. Property values are plummeting in a lot of different ways. It's a crisis. The commission, not out of the goodness of its heart, but the commission sends out guidance specifically in that period of time that says, don't be taking the market and setting appraisals based on these distressed sales in the market too literally. And the reason why they did that is because if you ended up actually marking to market everything based on those distressed appraisals, instead of a couple hundred banks failing, you would have had a couple thousand banks failing during that period of time. And they recognize that's not the appropriate response. To some extent, you're going to have to live out the dislocations of 2008 and see how it all plays out. And what happens? Our guys are told exactly what their appraisals are, how, even when they're older appraisals, why they're still valid bases. They see that literally $80 million has been reserved as a consequence of the fall in the market. There is response. There is communication. That's what an audit is about. An audit is not a guarantee that the final decision is going to be absolutely right. The audit is designed to show that the company has done what it's supposed to do. And what happened here, obviously, is the company did exactly the opposite of what it was supposed to do. The company defrauded both of our clients and KPMG, provided them with false information, and on that basis. What exactly was the false information they provided? They were giving us their assessment of the value of the properties of the collateral that were fundamentally different. They had a whole different set of assessments that they created off the books that significantly reduced those numbers. And so as a consequence of that, you know, had they given us, you know, shown us that those numbers were, you know, that there had been much greater drops, that would have been a different issue. Because we were looking at this as against the market itself, trying to take into account the fact that you're not supposed to deal with distressed sales. And the commission itself recognized that, you know, we took off 30% in Nevada, and the market says about 30% and the Shuler standards say about 30%. In Arizona, we did 15% or 13% and it was 16%. I mean, audits are not perfect. These are ranges of reasonableness, and what our client did in this particular context, what our clients did here, is exactly, I think, what you would have asked for by any auditor behaving the way he did. Was Tier 1 a public company? I thought it was. Yes, it was a public company. I didn't see any discussion of investor impact. I think there has been. I think there is private litigation actually ongoing. Did a bank regulator testify? No, I don't believe so. And the other person who didn't testify was the controller. And remember, the SEC had an agreement with the controller. So if they had wanted to testify that somehow the auditors had not done their jobs in terms of dealing with the controller, they could easily have called him to testify, and they chose not to do that for whatever reason. We asked, actually, for an adverse inference based on the fact that they had control over the person whom they say we did not discuss exactly what was going on here. I mean, that is a central element of independence, independent evaluation within internal controls. And in our judgment, allowed to perform without the benefit of fraud, it would have been a complete control. Isn't part of the problem here, it seems to me, that you start with the general proposition that the auditors have the right to rely upon representations by management and that fraud is not necessarily the first thing that they're looking for in an audit. But in this case, you hand the prior examination in which they say the internal asset review is unsatisfactory, asset classification is inadequate, they even used the word management is exceptionally poor, credit administration is inept. I mean, I think part of the problem is there were so many red flags going into this audit that that seems to be where they're saying they should have done more. But again, OTS gave them a, essentially, even though it downgraded them, one, it didn't close them down. Two, it didn't say, you know, they made changes as a consequence of it. They reduced the reserve significantly as a consequence of that, and that's what they showed to us. And we took that at face value as reflecting their best judgment as to the value of the collateral. They actually lied to us, but it was not unreasonable to say under those circumstances that they reacted to what OTS was doing in a seemingly sensible way, and then we did exactly what you would normally do, evaluate it and say, yeah, it's okay. It's within a range of reason. There's no single answer in this context. This is an exercise of judgment, and the Commission shouldn't be in the business of punishing auditors simply for the exercise of judgment if they make a mistake. I'd like to reserve the rest of my time. Thank you. Mr. Harris? May it please the Court, we agree, of course, with Mr. Phillips' submission, but if the Court were to sustain liability, the sanction should be vacated for two reasons. One, substantive. A lifetime bar cannot be imposed in a negligence case because it is punitive. It is certainly punitive here and, therefore, unlawful. And second is procedural. If a lifetime bar could ever be imposed in a negligence case, the Commission has a heightened burden of explaining why it is remedial, not punitive, that the Commission wholly failed to discharge it here. If the Court could get past both of those, you also would have to confront the Appointments Clause issue. On the punitive point, we have made the challenge throughout. Well, on that point, courts always have the obligation to determine if they have jurisdiction. Do we have to address the Appointments Clause issue before we get to anything else? If the Court were to vacate the liability order in its entirety, the Court does not have to reach the Appointments Clause. If you were to sustain liability and have any sanction remain against our two clients, the Court would have to reach the Appointments Clause issue because this case was tried before an unconstitutional officer. So the Court can avoid the Appointments Clause question only by vacating the liability determination, which is the right answer, by the way. That's a good way to resolve the case. But if the Court gets to the sanctions point, you also have to reach the Appointments Clause point. On punitive, we have made this point over and over again. This is a shorthanded Commission, two-to-one. Commissioner Piwar in dissent said it was punitive. We challenged it on appeal as punitive. And what does the Commission say in their brief to this Court? Nothing. The word punitive doesn't even appear in their brief in connection with our challenge. They don't address any of the cases. Judge Loken, you've been asking the last couple of days about our favorite cases, various counsel. On the punitive standard, the Arthur Lipper case, the McCarthy case, the Paz One case, and the Stedman case all say that the imposition of a lifetime bar in a negligence case is punitive because it is palpably disproportionate to the conduct. The Commission has no substantive response to those cases. In these circumstances, where there is only negligence, where there was considerable regulatory uncertainty at the time, as evidenced by the 2008 guidance, where there is no likelihood of the recurrence of the confluence of events of a world-shattering financial crisis and fraud committed by management, and where there is no materiality. And Judge Loken, to go to your question about investor loss, because the Commission failed to prove that the conduct of our clients had any material effect on the financial statements, there is no causal effect to any investor loss from the parent company from the closure of this bank. By the way, this is the only case the Commission ever brought against any auditor arising out of a financial crisis. And this is the case they chose to bring, where the executives were defrauding the auditors who went to jail under indictments that charged them with defrauding the auditors? Our clients, if they did anything wrong, they certainly didn't warrant getting their licenses yanked for life. But that is what the Commission is going to stand up next and tell you is acceptable. If any case involving negligence allows lifetime bar, and we submit it does not, there definitely is a heightened burden of explanation. The four cases I just cited say that, as well as the Hanley case from the Second Circuit, and the SAAD case, S-A-A-D from D.C. For 50 years, courts have been telling the Commission, if you impose a lifetime bar, you must give us enough reasons that we, the judiciary, can exercise our powers of meaningful judicial review. This record, Your Honor, this decision, the addendum to our briefs, pages 22 to 24, contains the entirety of the Commission's reasoning. It is nonsense. It is words. If it were a complaint filed in federal district court, it wouldn't pass the Twombly standard. All they do is recite the conclusions without reciting any facts that support them. For example, they say negligence can, a negligence auditor, a negligence auditor can affect the Commission's processes as much as an intentional auditor. I suppose that's true in the abstract, but they never try to tie it to these auditors or this conduct, and we submit that the heightened burden has not been met here. The court, therefore, should vacate the sanctions order in its entirety. This is a censure case if it involves sanctions at all, or at most, Your Honor, reinstate the ALJ's suspensions of a year or six months. The Hanley case says when the Commission overrides the ALJ, it must provide a reasoned explanation. There is none here. That seems to me to be inconsistent with your other argument of the appointments clause argument. It seems to be, I thought your brief was inconsistent in arguing, well, they don't really have any independence, but then when the board does exercise independence, you say, well, they shouldn't have exercised independence. There seems to be some dichotomy between those two arguments. The reconciliation we submit, Your Honor, is the requirement imposed by the APA of reasoned decision making. The reason that the ALJ in the sanctions proceeding is entitled to some credence, and by the way, the reason that we think that they are officers in the first place is they are making the credibility determinations. They are viewing the witnesses from the government, from the respondent, and making the decision in the first instance what sanction is appropriate. Just as a fact finding is entitled to substantial deference in a Commission appeal and in this court, a credibility-based sanction also is. That's the holding of the Hanley case, and here the ALJ made that determination, and the Commission is entitled under the statute to override it, but if it overrides it, it must provide a reasoned explanation. To transition then to the appointments clause, the reason that the ALJ is and was an officer was that she was empowered by the statute and the delegation from the Commission to make that determination in the first place because she only got to the sanction after receiving evidence, hearing witnesses, ruling on motions, conducting a trial, and issuing an initial decision in sanctions, all of which the Supreme Court told us in the Freytag decision is what makes, in the context of a federal adjudicator, an officer. And as the Tenth Circuit said in the Bandemere case, which involves the SEC's ALJs, it is 100% on point with this case, every Supreme Court case, every indicium of officer status points here towards being an officer. In fact, the Commission's position is bizarre, Your Honor. They're saying that a federal judge, a judge of the Commission, Judge Folak, who we call Judge, we call Your Honor, who presides over the trial, who has the ability to kick people out of the courtroom, compel their appearance, hear the evidence, take evidence out, rule it in, shape the administrative record that then comes to this court for substantial evidence review, is on par, according to the Commission, with a file clerk or a gardener or a window washer, all of whom have important functions in our federal system, but they are not making decisions that affect people's lives, including taking away their livelihoods for life. The Supreme Court has considered on seven separate occasions whether federal adjudicators are officers. Every single time it has said yes. Court clerks, judges of elections, circuit court commissioners, district court commissioners, military judges, and, of course, the special trial judges. The Supreme Court has never held that a federal adjudicator is not an officer, as makes sense. We submit that one who sits in judgment under the laws of the United States is necessarily, essentially, fundamentally, and should be an officer. Certainly any officer, any judge who can try APA 556, 557 cases, as the SECALJs do, is an officer. And it's not coincidentally, rather, that the Exchange Act refers to them as officers. So we submit for that reason, in addition, the sanctions here and the liability must be vacated. Again, to recap, the easiest way to resolve the whole thing is to throw it out and it never should have been brought in the first place and it should not survive. The sanction needs to be reduced regardless. And then if all of those things happen, we submit the officer status should be resolved and the court should follow Vandermeer and not create a circuit split on this important question. The one question I have about the constitutional issue is, in one sense, it would be easy to resolve the constitutional impediment by just having the commission appoint the ALJs as opposed to the chief ALJ, which is done in some agencies, right? That's correct. So the practical effect, other than maybe how the appointment is made and some of the tenure issues, would be the same. But this is not an insurmountable problem. The commission could appoint its own ALJs without amending a single statute, Your Honor. As a matter of fact, the APA says each agency shall appoint its ALJs. Arguably, the commission is currently in violation of statute as well as the Constitution. Why the commission hasn't done that yet, I'll let my colleague respond. Thank you, Your Honor. Did you have to look at the APA legislative history to see if this issue was ever discussed? It was discussed in great detail, Your Honor. There were two competing proposals that were rejected. One was to put the appointment of the ALJs in the judicial conference, and the Congress rejected that because they were inferior officers, but the judicial conference is not a court of law under the Appointments Clause. So this was exactly addressed. They anticipated it, Ms. Dreddy. They got it right way back then. Thank you, Your Honor. Ms. Barbero? Is that right? That's correct. Megan Barbero, on behalf of the Securities and Exchange Commission, and I will be addressing the Appointments Clause issue in the case. First, I'd like to start with some of the representations that have been made about the function and duties of the ALJs within the commission's administrative proceedings. Nothing that the ALJs do binds the commission or third parties. ALJs cannot issue orders that have their own force and effect, and they do not impose sanctions. Only the commission does that. The commission reviews every decision by an ALJ where any party asks for the commission's review, and even in cases where no review is sought, the commission retains the right to review, and it issues finality orders in every case. It is those finality orders, the orders of the commission, that impose sanctions, that set the date on which any sanctions will take effect. These ALJs are not exercising significant authority. They are not constitutional officers. Instead, they are agency employees who are exercising duties within limits carefully prescribed by Congress and the commission. In the 70 years since Congress enacted the APA until this recent litigation, no one had suggested otherwise. And I would like to address the contention that the Supreme Court has set some sort of rule that anybody exercising adjudicative authority in any respect in the government is an inferior officer. That's simply not the case. The Supreme Court has never considered whether administrative law judges are inferior officers exercising significant authority, and as we argue, they are not under the test of force in Buckley. If we look at the commission's organic statute, this is 78D1, it's the general delegation statute that applies to the commission, and it provides that the commission can delegate any number of its functions to administrative law judges, an individual commissioner, any other employee of the commission. And in any case where the commission exercises its authority to delegate a function under Section B, the commission retains the right to review any action taken on delegated authority at any time. The commission in ALJ cases can step in and exercise its plenary authority over the proceedings. It can review sua sponte. And I'd also like to address the idea that the ALJ is binding the evidentiary record in some respect. It's simply not true. It's not true under the statute or under the commission's regulations. It's true as a practical matter. No, Your Honor. To a significant extent. Well, don't run from reality. In no respect do I intend to run from reality, Your Honor, but it's simply not true. You haven't been on this side of the bench for 25 years and seen the deference that's consistently paid to ALJ's operating under the administrative procedure. Your Honor, I'd like to make several responses. First, in Universal Camera Corps, which is a 1951 Supreme Court decision, the court made clear, as was consistent with congressional intent and the legislative history of the APA, that the ultimate agency decision-maker retained the authority in every case to review de novo the factual and legal findings of the administrative law judges. Now, in addition, the commission- We have that authority vis-a-vis district judges, too. In every case. With the right to appeal to us. Your Honor, when a district court acts, it is very different than an active administrative law judge. A district court is acting in its own name. Its orders have immediate force and effect. The district court can issue contempt sanctions, which has no counterpart in what the administrative law judges do. District courts can call on the U.S. Marshals to enforce their orders. There's simply no- I'm sure I can find procedural analogues in ALJ proceedings, maybe not with respect to immediate enforcement of an order, but in terms of controlling the proceedings, disciplining lawyers, and so forth and so on, probably some contempt powers. I respect- Adjudicators adjudicate. That includes making decisions, even if they're subject to review. I respectfully disagree, and I would urge the court to look at the commission's regulations, which we've cited in our brief. The commission review of ALJ decisions, even evidentiary decisions, is very much unlike this court's review of a district court's evidentiary decisions. The commission may hear evidence itself. It may hear from witnesses. It may take new evidence. Even if a party's evidence is excluded, such as it were, by an administrative law judge, that evidence is still part of the record. The party can make a proffer. The commission can consider that evidence. And it's not simply as it would be if this court were reviewing an evidentiary decision, that the commission would say, well, we will remand to the administrative law judge for additional findings. The commission can't do that. We agree with the 10th Circuit on this issue. Does that end this case? Your Honor, if you were to agree with the 10th Circuit on this issue, it would not end the constitutional litigation concerning No, no, no, no. Why is this an all or nothing? The government appearing in our court always has two or three different fallback positions if their favorite statutory or constitutional argument fails. And yet here we have something in which a massive horrible was paraded and no fallback position. I don't understand that. Many of them come to mind to me. I won't recount them because they aren't argued. But I'm flabbergasted, frankly, that the government takes this, the sky is falling, we don't win on this particular argument position. Well, Your Honor, the question of separation of powers goes beyond merely the Appointments Clause issue that's presented in this case. There's the removal challenge to the administrative law judges, the dual layers of removal, which has been briefed in the Timber Vest case, which is pending in the D.C. Circuit. So even if this court were to, well, if this court were to agree with us in this case that the ALJs are employees who are not binding the commission or third parties, then that resolves. This case, we care about this case. If you lose this argument being so firmly and effectively argued, but if you lose this argument, do we have to reverse this case across the board? Your Honor, in Bandemir, the Tenth Circuit vacated the commission's decision when it ruled against us on the Appointments Clause, and petitioners have asked for the same here. I'm not saying we agree with their resolve. I'm saying if we agree with their position on the constitutional argument, does that necessarily end this case as they thought it ended their case? And the government gives me no basis to say otherwise. We have not made an argument otherwise, that is correct. And I'm floored as to why. Well, if I may, Your Honor, turning back to the argument that we have made, which is that the ALJs are employees and not constitutional officers, I do think it's significant that in the 70 years that this system has been in place, where Congress established employees who would be appointed not by the head of the department, but by and for each agency, civil service employees, as the Supreme Court said in Ramspect, to offer an independent baseline in a case against which respondents in that case could argue to the ultimate agency decision maker and ultimately to this court. And that's exactly what happened here. The ALJ made an initial decision on sanctions. Petitioners urged this court that the commission erred by failing to defer sufficiently to the ALJ's finding in this case. But the commission exercises de novo review, and that means it takes a look, a new look at the entire record. And here the commission disagreed with the ALJ's sanctions determination. It issued its own opinion, its own sanctions determination. And the ALJ is playing exactly the role that Congress envisioned, which is to provide an independent baseline. Now, the appointments clause is about political accountability, and the commission ultimately is accountable for every decision. Now, where did you get that insight from in the late 18th century? No, Your Honor. I'm even in the recent 1930s or 40s or what? In many of the Supreme Court's decisions addressing the appointments clause, including or the separation of powers, including free enterprise fund and the Freitag decision, the court has discussed political accountability, has discussed the concern about one branch not aggrandizing itself. And that's why, as Judge Poloi points out, for this not insurmountable problem, you can keep political accountability out of the equation by simply the agency heads properly doing it, instead of delegating to a sea of lower level decision makers. And that's one of the reasons we know that the ALJs are employees and not officers, because the commission can keep decision making to itself. Now, again, going back to practicality. I'm talking about the appointment. You can set up a process for appointment that ends with the commissioner instead of the chief ALJ or some other bureaucrat that preserves the guards against political influencing of hearing officers. By the way in which they're selected. But if the politically accountable agency head were to appoint, this is one of the problems that Congress was trying to avoid by setting the ALJs up as civil service employees and not political constitutional officers, was to avoid them being indebted in some respect to the agency head so that you could get the independent baseline decision from a civil service employee against which you could argue to the commission. Has the D.C. Circuit decided its case in that? The case was argued on May 24th, and it has not been decided yet. Okay. So if we agree with the 10th, then there's still no conflict. And just- The only conflict is if we accept your opinion. Only Circuit got it. Well, again, we have no decision yet from the D.C. Circuit in Vancouver. Yeah, then they could create the judgment. I assume this is probably going to end up in every circuit at some point. It's got an SEC enforcement action. But the time has not expired for an appeal from the 10th Circuit opinion yet, right? For a petition for a decision. It has not. Okay. So I assume you're not prepared to say whether you're going to seek one. That's not my decision to make here on Earth. Thank you. Mr. Ostrowski, can I come close? Absolutely, Your Honor. Thank you. Thank you so much. May it please the Court, Daniel Ostrowski for the Securities and Exchange Commission. As Ms. Barbero said, I'll be addressing the sanctions and liability portion of the case. I'd like to first just take a step back and emphasize that auditors are critical to the integrity of the report. As the D.C. Circuit put it in McCurdy, for the financial markets to operate efficiently, indeed for them to operate at all, information must have some measure of reliability. And for that to happen, investors need to know that public financial statements have been subjected to the rigors of independent and objective investigation and analysis. And in this case, substantial evidence supports the Commission's finding that petitioners failed in their professional responsibilities. It seems to me that the key piece of evidence in this case is what, Your Honor, Judge Molloy, you identified, which is the OTS report. Because I think, frankly, petitioners have done a very nice job in their briefing and their presentation today of sort of complicating issues. But if you just take a step back, the OTS report identified in October 2008 everything that we're talking about today. It said that management is exceptionally poor and had breached their fiduciary duties. Let me just tell you, jump ahead. So what bothers me about this, because I think it's quite relevant, is in finding the highly unreasonable or less than highly unreasonable, all those kinds of ultimate findings that lead up to warrant sanctions, how can you make those findings and conclusions in this case without having input from the bank regulators as to what they thought of this problem? Unlike investors, and most obviously, if the bank regulators choose to close the bank, the investors are clobbered. But the investors may or may not, we don't know what the suffering would be if the bank regulators would say, yeah, we don't like that, clean that up, but stumble on. So it seems to me we need to know in order to gauge the seriousness of these misdeeds, if that's the word, the impact that they would have on the bank regulators. SEC isn't in that business. Your Honor, I believe the OTS report is the input of the bank regulators. Well, we know that was their view at the time, but we don't know their view as to these follow-up activities, audit activities, what was being audited. Well, I mean, if you want to, I would sort of think that you would want to avoid having auditors be judged by hindsight, but if you want to go down that route, Your Honor, I would point the court to the Office of Inspector General report from the Treasury Department. Well, let's take the 0-9 late disclosed issue where they say, well, what's the big deal if it's in the first quarter of 0-9 or we backdate or we back and fill the 0-8 report where maybe it's been disclosed it didn't appear. How can we judge the seriousness of that if we don't know what the bank regulators would have thought of that issue? I mean, and again, I would – the bank regulators think this is a very big issue. So in the fall of 2009, OTS comes back in and they make the bank take updated appraisals. Well, what happens? The bank records a $120 million loan and the – sorry, $120 million loss, and that leads to the collapse of the bank. So, again, I think that the court should be judging or the commission – it's proper for the commission to judge petitioner's conduct at the time without reference to sort of what happens later. But if you want to go down that route, we're on very strong ground. How can you base a permanent ban on practice on the 0-9 appraisals when they were taken into consideration in the first quarter of 0-9? And isn't that just an auditor's judgment whether I go back and restate the 2008? I mean, within a couple months, it's all reflected and you're permanently banning. I guess the permanent ban is what's bugging me. Well, and maybe let me – let me talk about the suspension. It's not a suspension. And you made it very clear in the order. We are not suspending you. We are permanently banning you. Right. I think it's more accurate, Your Honor, to think of it as an indefinite ban because when the commission – it includes in these indefinite bans. You used the word lifetime, didn't you, in the order? I don't believe – I think the order says that the petitioners are permanently denied the privilege of appearing or practicing before the commission. But I guess the point I want to convey is when the commission says that there's a right to apply for reinstatement and provides a term of years after when that may happen, that performs a very important signaling function. Because if you look at what has happened in these cases, if someone is subject to a true – let's call it a permanent ban. What happens is it's very difficult for people to come back from that. I'm aware of two cases where that's never happened. In contrast, where there's a ban but there's a right to apply for reinstatement, the commission does grant applications for reinstatement. I'm not aware of any order denying an application for reinstatement in such circumstances. But maybe this is too simple an analogy, and I don't know about every jurisdiction. But in a lot of jurisdictions, and I know mine, if an attorney is disbarred, they can come in after a certain number of years and ask to be reinstated and show they went to continuing legal education, but still you're disbarred. I mean you carry that stigma with you for the rest of your life. And this seems to me is the equivalent. It's a lifetime ban with opportunity to come in and maybe they'll let you back in. Maybe they won't. Maybe they'll take three years. That's what the dissent says. It's not three years. It may be six years because they may take three years to do it. How long does it take to get one of these reinstatements? The dissent says it's a long, long time. Your Honor, there's nothing in the record on that? Other than what the dissent says. Well, what the dissent says with respect is not that it does take years. The dissent says that it can take years. But I could answer the question if you'd like me to go outside the record. And I've spoken with the folks who process these applications, and there's basically a two-stage process. First, an applicant would reach out to the office of the chief accountant, that's staff at the commission. And they would submit an application with appropriate documentation. That process typically takes in the neighborhood of several months. Then the chief accountant, him or herself, will make a recommendation to the commission. And the commission then has to evaluate. Typically, historically, going back in the mine run of cases, that process has taken anywhere from several weeks to several months. There may be cases, there may well be some cases where it's taken longer. But I don't think that this case is really the proper vehicle to debate the reinstatement process. The petitioners haven't applied for a reinstatement. If they apply for a reinstatement and they believe that they're not being treated fairly, rest assured, we'll be back in this court and we can have a discussion about that. And there will be a record. We know it will take five years. I'm sorry, Your Honor? We know it will take five years. No, we don't know that it will take five years, Your Honor. Our court's the fastest circuit in the country, and we go from notice and appeal to disposition in plus or minus 12 months. I understand. But what I'm saying is that it has not taken the commission that long to process these applications in the past. If it does, rest assured, you'll hear about it, and then you will have a record to evaluate it. And the commission has said that when it considers applications for reinstatement, what it's trying to do is make a judgment as to whether the auditor is presently fit to practice before the commission. It is similar, Your Honor, I think, to the bar reinstatement process. And if the record at the time shows that the record doesn't support a commission decision to deny reinstatement, we'll be back here and that would be proper for the court to review. It seemed to me that the commission's three or four pages of sanctions analysis could have been lifted and applied to anyone who was sanctioned for any reason. I did not see the particularity of the heightened burden type analysis that I would have expected, particularly when the ALJ reasoned it contrarily and when there was a dissent on the issue. And I would take issue- And I don't know quite what to make of that, but I'm very troubled by it. I think there's sort of an intuitive appeal to that, but ultimately the legal question for the court is whether it was a gross abuse of discretion for the commission to order the sanction that it did. And with respect to the ALJ's analysis in particular, I understand the petitioners like the ALJ's bottom line, but please do look at that analysis. And what you'll see is it's this very rote, formulaic recitation of factors. And the ALJ finds that petitioners' reliance on FAS 157 is belied by the record. The ALJ cites commission precedent, in fact, where there was a bar with the right to apply for reinstatement after four years in the case of negligence. Nonetheless, ends up at six months and a year, and there's no explanation of why the ALJ is rejecting the division's request. But ultimately, and the case law, even from the Second Circuit, recognizes this, it's the commission's job to make the appropriate sanctions determination. That's what it did here. If we agree with the dissent, however, that this is a punitive sanction, is it improper then? Yes, Your Honor. If it's punitive, the commission must impose these sanctions for a remedial purpose, not a punitive one. The remedy, I think, would be to remand to the commission to further explain. If the failure in the court's view was a lack of explanation, I think you'd remand it for further explanation. Unless the court has any further questions. Thank you, Your Honor. Yes, just over a minute, Your Honor. With any luck, Your Honor, I'll give you back a few of those seconds. Actually, I really want to make one basic point, which is what the panel has already recognized, which is the importance of the OTS in all of this. And there are two things about OTS that I think is worth keeping in mind as you analyze this, aside from the fact that no one testified from the agency as to the impact of the audit in its own decision-making. First of all, OTS says categorically, as is in A3232 in its report, that with respect to ALLL, management addressed our concerns during the quarter ended June 30, 2008. So there were red flags, and management responded to those red flags. And if you look at page 15 of our opening brief, we go through the actions taken by the bank in response to OTS, creating new layers of review, additional analyses of that collateral, and creating stronger internal controls. And at the end of the day, I didn't hear my friend on the other side say anything about the internal controls in this particular case. It seems to me clear that there is no basis for a finding of a rule of one and a two violation in this run mine case, candidly, especially as the poster child of the 2008 disaster, that these are the only auditors. That's just fundamentally unfair on its face. If there are no other questions, Your Honors, I urge you to reverse. Thank you. Thank you, Counsel. Oh, you freaked me out. All right. Aha. I thought I heard we were getting some seconds back. You heard that from Mr. Phillips, Your Honor. My friend from the Justice Department makes three points on the Constitution, each of which the Supreme Court has rejected. First, that finality is required. That's rejected by Edmund at page 665. Second, that these officers don't exercise significant authority. That's rejected by Freytag at 881 to 82. And third, that the deference point somehow matters. The Supreme Court in Freytag at 874 note 3 said that is, quote, not relevant. It's also not true if you read the Commission's Claussen decision. They do, in fact, defer to the ALJs. On the sanctions, Your Honor, we are all licensed professionals. We all know the difference between a suspension and a bar. This is a bar case. The only justification offered by the Commission in footnote 84 for imposing a bar rather than a suspension is, quote, unquote, its usual practice. Your Honor, if its usual practice is to permanently bar everybody whose name starts with A or B, that is arbitrary and capricious agency action. This is arbitrary and capricious agency action, and it should be reversed. Thank you. Thank you, counsel. The case has been very well briefed and argued by all involved. The argument's been helpful. It's an important, difficult case. We'll take it under time.